1  **GUTRIDE SAFIER LLP**
   Seth A. Safier (State Bar No. 197427)
2    seth@gutridesafier.com
   Marie A. McCrary (State Bar No. 262670)
3    marie@gutridesafier.com
   Todd Kennedy (State Bar No. 250267)
4    todd@gutridesafier.com
   Kali R. Backer (State Bar No. 342492)
5    kali@gutridesafier.com
   100 Pine Street, Suite 1250
6  San Francisco, CA 94111
   Telephone: (415) 639-9090
7  Facsimile: (415) 449-6469

8  *Attorneys for Plaintiffs*

9              UNITED STATES DISTRICT COURT

10           NORTHERN DISTRICT OF CALIFORNIA

11 | JONATHAN GABRIELLI and JAIME      | CASE NO.
   | AYALA, individuals, on behalf of themselves,
12 | the general public, and those similarly situated, | CLASS ACTION COMPLAINT FOR
   |                                   | INVASION OF PRIVACY UNDER
13 |             Plaintiffs,           | CALIFORNIA'S CONSTITUTION;
   |                                   | INTRUSION UPON SECLUSION;
14 |        v.                         | WIRETAPPING IN VIOLATION OF THE
   |                                   | CALIFORNIA INVASION OF PRIVACY
15 | UPBOUND GROUP, INC.; and RENT-A-  | ACT (CALIFORNIA PENAL CODE § 631);
   | CENTER, INC.,                     | USE OF A PEN REGISTER IN VIOLATION
16 |                                   | OF THE CALIFORNIA INVASION OF
   |             Defendants.           | PRIVACY ACT (CALIFORNIA PENAL
17 |                                   | CODE § 638.51); COMMON LAW FRAUD,
   |                                   | DECEIT AND/OR
18 |                                   | MISREPRESENTATION; UNJUST
   |                                   | ENRICHMENT; AND TRESPASS TO
19 |                                   | CHATTELS
20 |                                   | JURY TRIAL DEMANDED

21

22

23

24

25

26

27

28

- 1 -
CLASS ACTION COMPLAINT

# TABLE OF CONTENTS

INTRODUCTION ..................................................................................................................4

THE PARTIES ....................................................................................................................6

JURISDICTION AND VENUE ............................................................................................7

SUBSTANTIVE ALLEGATIONS .......................................................................................7

    A.    Defendants Programmed the Websites to Include Third-Party Resources that Utilize Cookie Trackers. ..............................................................................7

    B.    Defendants Falsely Informed Users That They Could Decline the Websites' Use of Cookies. ....................................................................................14

    C.    The Private Communications Collected As a Result of Third Party Cookies Transmitted When Visiting Defendants' Websites...........................................26

        1.    Facebook Cookies...........................................................................26

        2.    Google Cookies...............................................................................30

        3.    TikTok Cookies...............................................................................34

        4.    Adobe Cookies................................................................................38

        5.    Microsoft Bing Cookies..................................................................39

        6.    Additional Third Party Cookies......................................................41

    D.    The Private Communications Collected is Valuable. ....................................44

PLAINTIFFS' EXPERIENCES .........................................................................................45

TOLLING ..........................................................................................................................50

CLASS ALLEGATIONS ....................................................................................................50

CAUSES OF ACTION ......................................................................................................53

    First Cause of Action: Invasion of Privacy....................................................53

    Second Cause of Action: Intrusion Upon Seclusion......................................55

    Third Cause of Action: Wiretapping in Violation of the California Invasion of Privacy Act (California Penal Code § 631)..................................................57

    Fourth Cause of Action: Use of a Pen Register in Violation of the California Invasion of Privacy Act (California Penal Code § 638.51) ...........................61

    Fifth Cause of Action: Common Law Fraud, Deceit and/or Misrepresentation...............63

    Sixth Cause of Action: Unjust Enrichment....................................................66

Seventh Cause of Action: Trespass to Chattels ..................................................................67

CLASS ACTION COMPLAINT

Plaintiffs Jonathan Gabrielli and Jaime Ayala ("Plaintiffs") brings this action on behalf of themselves, the general public, and all others similarly situated against Upbound Group, Inc. and Rent-a-Center, Inc. ("Defendant" or "Motorola"). Plaintiffs' allegations against Defendants are based upon information and belief and upon investigation of Plaintiffs' counsel, except for allegations specifically pertaining to Plaintiffs, which are based upon Plaintiffs' personal knowledge.

## **INTRODUCTION**

1.      This Class Action Complaint concerns an egregious privacy violation and total breach of consumer trust in violation of California law. When consumers visit Defendants' websites (rentacenter.com, upbound.com, and acima.com, each a "Website" and collectively, the "Websites"), Defendants display to them a popup cookie consent banner. Defendants' cookie banners disclose that the Websites uses cookies but expressly give users the option to control how they are tracked and how their personal data is used. Defendants assure visitors that they can choose to "Decline" cookies as shown in the following example screenshot:



2.      Like most internet websites, Defendants designed the Websites to include resources and programming scripts from third parties that enable those parties to place cookies and other similar tracking technologies on visitors' browsers and devices and/or transmit cookies along with user data. However, unlike other websites, Defendants' Websites offer consumers a choice to browse without being tracked, followed, and targeted by third party data brokers and advertisers. However, Defendants' promises are outright lies, designed to lull users into a false sense of security. Even after users elect to "Decline" cookies, Defendants surreptitiously enable several third parties – including Google LLC (DoubleClick and Google Analytics), Meta Platforms, Inc. (Facebook), ByteDance Ltd. (TikTok), Adobe Inc. (dpm.demdex.net), Microsoft Corp. (Microsoft Bing and AppNexus), PubMatic, Inc., The Trade Desk, Inc. (adsrvr.org), Dun & Bradstreet Holdings, Inc. (Eyeota), Comscore, Inc. (Scorecard Research), Everest

Technologies, Inc., and *many more* (the "Third Parties") – to place and/or transmit cookies that track users' website browsing activities and eavesdrop on users' private communications on the Websites.

3.    Contrary to their express rejection of cookies and tracking technologies on the Websites, Defendants nonetheless caused cookies, including the Third Parties' cookies, to be sent to Plaintiffs' and other visitors' browsers, stored on their devices, and transmitted to the Third Parties along with user data. These third-party cookies permitted the Third Parties to track and collect data in real time regarding Website visitors' behaviors and communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data.

4.    The Third Parties analyze and aggregate this user data across websites and time for their own purposes and financial gain, including, creating consumer profiles containing detailed information about a consumer's behavior, preferences, and demographics; creating audience segments based on shared traits (such as Millennials, tech enthusiasts, etc.); and performing targeted advertising and marketing analytics. Further, the Third Parties share user data and/or user profiles to unknown parties to further their financial gain.

5.    This type of tracking and data sharing is exactly what the Website visitors who clicked or selected the "Decline" link on the Websites' cookie consent banners sought to avoid. Defendants falsely told Website users that they respected their privacy and that they could avoid tracking and data sharing when they browsed the Websites. Despite receiving notice of consumers' express declination of consent, Defendants defied it and violated state statutes, tort duties, and also breached their contractual duties and the implied covenant of good faith and fair dealing with Plaintiffs and those similarly situated Website users.

CLASS ACTION COMPLAINT

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**THE PARTIES**

6.      Plaintiff Jonathan Gabrielli is, and was at all relevant times, an individual and resident of Oakland, California. Plaintiff Gabrielli intends to remain in California and makes his permanent home there.

7.      Plaintiff Jaime Ayala is, and was at all relevant times, an individual and resident of Riverside, California. Plaintiff Ayala intends to remain in California and makes her permanent home there.

8.      Defendant Upbound Group Inc. is a Delaware corporation with its headquarters and principal place of business in Plano, Texas.

9.      Defendant Rent-a-Center, Inc. is a Delaware corporation with its headquarters and principal place of business in Plano, Texas.

10.     The Parties identified in paragraphs 8-9 of this Class Action Complaint are collectively referred to hereafter as "Defendants."

11.     At all times herein mentioned, each of the Defendants was the agent, servant, representative, officer, director, partner or employee of the other Defendants and, in doing the things herein alleged, was acting within the scope and course of his/her/its authority as such agent, servant, representative, officer, director, partner or employee, and with the permission and consent of each Defendants.

12.     At all times herein mentioned, each of the Defendants was a member of, and engaged in, a joint venture, partnership and common enterprise, and acted within the course and scope of, and in pursuance of, said joint venture, partnership and common enterprise.

13.     At all times herein mentioned, the acts and omissions of each of the Defendants concurred and contributed to the various acts and omissions of each and all of the other Defendants in proximately causing the injuries and damages as herein alleged.

14.     At all times herein mentioned, each of the Defendants ratified each and every act or omission complained of herein.

CLASS ACTION COMPLAINT

15.    At all times herein mentioned, each of the Defendants aided and abetted the acts and omissions of each and all of the other Defendants in proximately causing the damages, and other injuries, as herein alleged.

## JURISDICTION AND VENUE

16.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(d)(2). The aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs; and Plaintiffs and Defendants are citizens of different states.

17.    The injuries, damages and/or harm upon which this action is based, occurred or arose out of activities engaged in by Defendants within, affecting, and emanating from, the State of California. Defendants regularly conduct and/or solicit business in, engage in other persistent courses of conduct in, and/or derive substantial revenue from products and services provided to persons in the State of California. Defendants have engaged, and continue to engage, in substantial and continuous business practices in the State of California.

18.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in the state of California, including within this District.

19.    Plaintiffs accordingly allege that jurisdiction and venue are proper in this Court.

## SUBSTANTIVE ALLEGATIONS

### A.    Defendants Programmed the Websites to Include Third-Party Resources that Utilize Cookie Trackers.

20.    Every website, including the Websites, is hosted by a server that sends and receives communications in the form of HTTP requests, such as "GET" or "POST" requests, to and from Internet users' browsers. For example, when a user clicks on a hyperlink on a Website, the user's browser sends a "GET" request to the Website's server. The GET request tells the Website server what information is being requested (e.g., the URL of the webpage being requested) and instructs the Website's server to send the information back to the user (e.g., the content of the webpage being requested). When the Website server receives an HTTP request, it

processes that request and sends back an HTTP response. The HTTP request includes the client's IP address so that the Website server to knows where to send the HTTP response.

21.     An IP address (Internet Protocol address) is a unique numerical label assigned to each device connected to a network that uses the Internet Protocol for communication, typically expressed as four sets of numbers separated by periods (e.g., 192.168.123.132 for IPv4 addresses). IP addresses can identify the network a device is on and the specific device within that network. Public IP addresses used for internet-facing devices reveal geographical locations, such as country, city, or region, through IP geolocation databases.

22.     Defendants voluntarily integrated "third-party resources" from the Third Parties into the Websites' programming. "Third-party resources" refer to tools, content or services provided by third-parties, such as analytics tools, advertising networks, or payment processors, that a website developer utilizes by embedding scripts, styles, media, or application programming interface (API) into the Websites' code. Defendants' use of the third-party resources on the Websites is done so pursuant to agreements between Defendants and those Third Parties.

23.     The Websites cause users' devices to store and/or transmit both first-party and third-party tracking cookies. Cookies are small text files sent by a website server to a user's web browser and stored locally on the user's device. As described below, cookies generally contain a unique identifier which enables the website to recognize and differentiate individual users. Cookie files are sent back to the website server along with HTTP requests, enabling the website to identify the device making the requests, and to record a session showing how the user interacts with the website.

24.     First-party cookies are those that are placed on the user's device directly by the web server with which the user is knowingly communicating (in this case, the Websites' server(s). First-party cookies are used to track users when they repeatedly visit the same website.

25.     A third-party cookie is set by a third-party domain/webserver (e.g., www.google-analytics.com.com; doubleclick.net; analytics.tiktok.com; facebook.com, etc.). When the user's

browser loads a webpage (such as a webpage of the Website) containing embedded third-party resources, the third-parties' programming scripts typically issue HTTP commands to determine whether the third-party cookies are already stored on the user's device and to cause the user's browser to store those cookies on the device if they do not yet exist. Third-party cookies include an identifier that allows the third-party to recognize and differentiate individual users across websites (including the Website) and across multiple browsing sessions.

26.    As described further below, the third-party cookies stored on and/or loaded from users' devices when they interact with the Websites are transmitted to those third parties, enabling them to surreptitiously track in real time and collect Website users' personal information, such as their browsing activities and private communications with Defendants, including the following:

- **Browsing History**: Information about the webpages a Website user visits, including the URLs, titles, and keywords associated with the webpages viewed, time spent on each page, and navigation patterns;

- **Visit History**: Information about the frequency and total number of visits to the Website;

- **Website Interactions:** Data on which links, buttons, or ads on the Websites that a user clicks;

- **User Input Data**: The information the user entered into the Websites' form fields, including search queries, the user's name, age, gender, email address, location, and/or payment information;

- **Demographic Information**: Inferences about age, gender, and location based on browsing habits and interactions with Websites' content;

- **Interests and Preferences**: Insights into user interests based on the types of Websites' content viewed, products searched for, or topics engaged with;

- **Shopping Behavior**: Information about the Websites' products viewed or added to shopping carts;

CLASS ACTION COMPLAINT

- **Device Information**: Details about the Website user's device, such as the type of device (mobile, tablet, desktop), operating system, and browser type;

- **Referring URL**: Information about the website that referred the user to the Website;

- **Session Information**: Details about the user's current Website browsing session, including the exact date and time of the user's session, the session duration and actions taken on the Website during that session;

- **User Identifiers**: A unique ID that is used to recognize and track a specific Website user across different websites over time; and/or

- **Geolocation Data**: General location information based on the Website user's IP address or GPS data, if accessible.

(Collectively, the browsing activities and private communications listed in the bullet points above shall be referred to herein as "Private Communications").

27.    Third-party cookies can be used for a variety of purposes, including (i) analytics (e.g., tracking and analyzing visitor behavior, user engagement, and effectiveness of marketing campaigns); (ii) personalization (e.g., remembering a user's browsing history and purchase preferences to enable product recommendations); (iii) advertising/targeting (e.g., delivering targeted advertisements based on the user's consumer profile (i.e., an aggregated profile of the user's behavior, preferences, and demographics); and (iv) social media integration (e.g., enabling sharing of users' activities with social media platforms). Ultimately, third-party cookies are utilized to boost website performance and revenue through the collection, utilization, and dissemination of user data.

28.    Defendants are best known for owning Rent-A-Center, which is one of the largest rent-to-own (RTO) retailers in the United States. Rent-A-Center operates physical stores that provide consumers with an alternative method for acquiring furniture, electronics, appliances, and other household goods by allowing them to rent products with the option to purchase later. Defendants also own other brands including Acima Leasing, a technology company that focuses

on providing flexible lease-to-own solutions for customers across a wide range of durable goods and retailers. Defendants also own and operate the Websites, which allow visitors to receive information about their products and company and purchase products and services. As they interact with the Websites (e.g., by entering data into forms, clicking on links, and making selections), Website users communicate Private Communications to Defendants, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data.

29.    Defendants chose to install or integrate the Websites with resources from the Third Parties that, among other things, use cookies. Thus, when consumers visit the Websites, both first-party cookies and third-party cookies are placed on their devices and/or transmitted. This is caused by software code that Defendants incorporate into the Websites, or that Defendants cause to be loaded. Because Defendants control the software code of the Websites, they have complete control over whether first-party and third-party cookies are placed on users' devices and/or transmitted to third parties.

30.    Defendants explained the third-party cookies they used on the Rent-a-Center Website as follows in the Rent-A-Center Cookies Statement:

> Cookies are small text les that are placed on your computer by the websites that you visit or ads you engage with. They are widely used in order to make websites work, or work more efficiently, as well as to provide information to the owners of the site. The use of cookies is now standard for most websites. We store both first-party cookies set by this website and third-party cookies set by other domains on this website.
>
> Categories of Cookies
>
> **Necessary Cookies:** These cookies are fundamental to website functionality and cannot by switched o without blocking features on the site.
>
> **Analytics Cookies:** These cookies allow us to gather analytics to improve the performance and functionality of our site. These analytics can include measurements on the popularity of a page, common patterns of how people browse around the site, and how frequently a certain feature is used. We usually aggregate the data for review but in some cases we may collect information on content you have viewed in order to understand what interests you most.

**Marketing Cookies:** These cookies are used to show advertising that is likely to be of interest to you based on your browsing habits. These cookies, as served by our content and/or advertising providers, may combine information they collected from our website with other information they have independently collected relating to your web browser's activities across their network of websites. In some cases, we can associate cookie information with an identiable [sic] individual. For example:
• If we send you a targeted email which includes cookies or similar technologies, we will know whether you open, read, or delete the message.
• When you click a link in a marketing e-mail you receive, we will also use a cookie to log what pages you view and what content you download from our websites.[1]

31.     Defendants further explained the third-party cookies they used on the Rent-A-Center Website as follows in the Rent-A-Center Privacy Policy:

We may collect certain analytics information automatically as you navigate our Services. This may include cookies, tracking pixels, tags or similar tools, such as session replay technologies that may log how you interact with our Services. For more information, please view the "How Do We Use "Cookies" and Other Tracking Technologies?" section below. We collect this information for the purposes of analytics and research, customer service, marketing and advertising, newsletters and related communications, and website security and maintenance.

…

**3. How Do We Use "Cookies" and Other Tracking Technologies?**

We may send one or more cookies to your computer or other device. We may also use other similar technologies such as tracking pixels, tags, or similar tools when you visit our Services. These technologies can collect data regarding your operating system, browser type, device type, screen resolution, IP address, and other technical information, as well as navigation events and session information as you interact with our Services. This information allows us to understand how you use the Services.

*What Are Cookies?*

Cookies are small files created by websites, including our Services, that reside on your computer's hard drive and that store information about your use of a particular website. When you access our Services, we use cookies and other tracking technologies to:

• Estimate our audience size and usage patterns;

---

[1] Rent-a-Center Cookie Policy (available at https://www.rentacenter.com/cookie-policy) (the "Cookie Policy").

CLASS ACTION COMPLAINT

- Store information about your preferences, allowing us to customize our Services according to your individual needs;
- Contact you to provide you with information or services that you request from us;
- Advertise new content, events, and services that relate to your interests;
- Provide you with more personalized content that is most relevant to your interest areas; and
- Recognize when you return to our Services.

We set some cookies ourselves and others are set by third parties.…

***What Types of Cookies Do We Use and Why?***

The following chart lists the different types of cookies that we and our service providers use on the Services, examples of who serves those cookies and links to the privacy notices and opt-out information of those cookie servers.

| Types of Cookies | Purpose | Who Serves (for example) |
|---|---|---|
| Essential | These cookies are required for the operation of the Services and enable you to move around the Services and use its features. Disabling these cookies can negatively impact the performance of Services. | Rent-A-Center Google |
| Functionality | These cookies are used to recognize you when you return to the Services. This enables us to personalize content for you and remember your preferences. These cookies also enable your interactions with the Services such as emailing us, enabling our chat services, and remembering your consent preferences. | Google LivePerson Salesforce Optimizely Zeta |
| Analytics, Performance, and Research | These cookies, beacons, and pixels allow us to analyze activities on the Services. They can be used to improve the functioning of the Services. For example, these cookies recognize and count the number of visitors and see how they move around the Services. Analytics cookies also help us measure the | Crazy Egg Salesforce Google Meta Pinterest Xandr Verizon/Oath Exponential Causal IQ Microsoft Bing Pandora |

CLASS ACTION COMPLAINT

| | | performance of our advertising campaigns to help us improve them and to optimize the content on the Services for those who engage with our advertising. | Zeta Verizon/Yahoo |
|---|---|---|---|
| Social Networking | | These cookies are used to enable you to share pages and content that you find interesting on our Services through third-party social networking and other websites. These cookies may also be used for advertising purposes. | Meta |
| Advertising | | These cookies and pixels are used to deliver relevant ads, track ad campaign performance, or track email marketing. | Google (Opt-out via Google Ad Settings) Meta Xandr Verizon/Oath Exponential Causal IQ Microsoft Bing Pandora Zeta Pinterest Verizon/Yahoo [2] |

**B.    Defendants Falsely Informed Users That They Could Decline the Websites' Use of Cookies.**

32.    When consumers in California visited the Websites, the Websites immediately displayed to them a popup cookie consent banner. As shown in the screenshot below, the cookie consent banner stated, "We use cookies to give you the best experience! We use cookies on our website. By clicking "Accept", you consent to the use of all the cookies according to our Cookie Policy." The "Cookie Policy" disclosed that the Website used necessary, analytics and marketing cookies. The banner then purported to provide users the opportunity to "Decline" cookies as shown, in the following screenshot from the Rent-A-Center Website:

---

[2] Rent-a-Center Privacy Policy (available at https://www.rentacenter.com/en/privacy-policy) (Last Updated: December 15, 2023) (the "Privacy Policy"). Defendants have subsequently updated the Privacy Policy but, based on information and belief, this version was in effect at the time of Plaintiffs' rejections of cookies on the Website.

We use cookies to give you the best experience!

We use cookies on our website. By clicking "Accept", you consent to the use of all the cookies according to our Cookie Policy. You may change your preference by visiting Cookie Settings. Read more about our Cookie Policy and Privacy Policy.

Decline    Accept

33.    Website users who clicked or selected the "Decline" cookies link, indicating their choice and/or agreement to decline or reject all cookies and tracking technologies in use on the Websites, could then continue to browse the Websites, and the popup cookie consent banner disappeared.

34.    Defendants' popup cookie consent banner led Plaintiffs, and all those Website users similarly situated, to believe that they declined or rejected all cookies and tracking technologies, especially those necessary, analytics and marketing cookies. The banner further reasonably led Plaintiffs and those Website users similarly situated to believe that Defendants would not allow third parties, through cookies, to access their Private Communications with the Websites, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, upon clicking or selecting the "Decline" cookies link.

35.    Defendants' representations, however, were false. In truth, Defendants did not abide by users' wishes. When users clicked the "Decline" cookies link, they provided notice to Defendants that they did not consent to the placement or transmission of third-party cookies that would allow those parties to obtain their Private Communications with the Websites. Nevertheless, Defendants caused the Third Party tracking cookies to be placed on Website users' browsers and devices and/or transmitted to the Third Parties along with user data.

36.    In particular, when users clicked or selected the "Decline" cookies link, Defendants nonetheless continued to cause the Third Parties' cookies to be placed on users' devices and/or transmitted to the Third Parties along with user data, enabling them to collect user data in real time that discloses Website users' Private Communications, including browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information,

user identifiers, and/or geolocation data. In other words, even when consumers like Plaintiffs tried to protect their privacy by declining cookies, Defendants failed to prevent cookies from being transmitted to Third Parties, enabling them to track user behavior and communications.

37.    Some aspects of the operations of the Third Party cookies on the Websites can be observed using specialized tools that log incoming and outgoing Website network transmissions. The following screenshots, obtained using one such tool, show examples of Third-Party cookies being transmitted from a Rent-A-Center Website user's device and browser to Third Parties even after the user clicked the "Decline" link on the Rent-A-Center Website's popup cookie consent banner.

CLASS ACTION COMPLAINT



**CLASS ACTION COMPLAINT**



**CLASS ACTION COMPLAINT**



CLASS ACTION COMPLAINT



CLASS ACTION COMPLAINT



CLASS ACTION COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28





38.    The screenshots above show the "Network" tab of Chrome Developer Tools, which contains a list of HTTP network traffic transmissions between the user's browser and various third party websites while the user visited and interacted with Defendants' Website at https://www.rentacenter.com/. The screenshots depict only network traffic occurring **after** the user declined all cookies using the cookie banner. As shown above, despite the user's

declination of all cookies, the user's interactions with the Rent-A-Center Website resulted in the user's browser making a large number of GET and POST HTTP requests to third party web domains like www.google-analytics.com.com; doubleclick.net; analytics.tiktok.com; facebook.com, and others. As further shown in the right-hand column of the screenshots, the user's browser sent cookies along with those HTTP requests to the third parties. These screenshots demonstrate that the Rent-A-Center Website caused third-party cookie data and users' Private Communications to be transmitted to Third Parties, even after consumers declined or rejected all cookies and tracking technologies by clicking or selecting the "Decline" cookies link. All of these network calls are made to the Third Parties without the user's knowledge, and despite the user's rejection of all cookies.

39.    The other Websites similarly cause consumers' devices to transmit user data to third parties—even after consumers reject cookies by clicking the "Decline" button—on those Websites.

40.    Website users' Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, are surreptitiously obtained by the Third Parties via these cookies.

41.    As users interact with the Websites, even after clicking or selecting the "Decline" cookies link, thereby declining or rejecting the use of cookies and similar technologies for personalized content, advertising, and analytics, as well as the sale or sharing of the user's personal information with third parties for such functions, or other purposes, more data regarding users' behavior and communications are sent to third parties, alongside the cookie data.  The third-party cookies that Defendants wrongfully allow to be stored on users' devices and browsers, and to be transmitted to the Third Parties, enable the Third Parties to track and collect data on users' behaviors and communications, including Private Communications, on the Websites. Because third-party cookies enable Third Parties to track users' behavior across the

Internet and across time, user data can be correlated and combined with other data sets to compile comprehensive user profiles that reflect consumers' behavior, preferences, and demographics (including psychological trends, predispositions, attitudes, intelligence, abilities, and aptitudes). These Third Parties monetize user profiles for advertising, sales, and marketing purposes to generate revenue and target advertising to Internet users. Advertisers can gain deep understanding of users' behavioral traits and characteristics and target those users with advertisements tailored to their consumer profiles and audience segments.

42.     The Third Party code that the Websites cause to be loaded and executed by the user's browser becomes a wiretap when it is executed because it enables the Third Parties—separate and distinct entities from the parties to the conversations—to use cookies to eavesdrop upon, record, extract data from, and analyze conversations to which they are not parties. When the Third Parties use their respective wiretaps on Website users' Private Communications, the wiretaps are not like tape recorders or "tools" used by one party to record the other. The Third Parties each have the capability to use the contents of conversations they collect through their respective wiretaps for their own purposes as described in more detail below.

## C.    **The Private Communications Collected As a Result of Third Party Cookies Transmitted When Visiting Defendants' Websites.**

### 1.    Facebook Cookies

43.     Defendants also cause third party cookies to be transmitted to and from Website users' browsers and devices to and from the **facebook.com** domain, even after users elect to reject all non-strictly necessary cookies (including Functional, Performance, Targeting, Social Media, and User Profile cookies). This domain is associated with Meta's digital advertising and analytics platform that collects user information via cookies to assist Meta in performing data collection, behavioral analysis, user retargeting, and analytics.[3] Meta serves targeted ads to web users across Meta's ad network, which spans millions of websites and apps.

---

[3] https://www.facebook.com/privacy/policies/cookies/.

44.     The facebook.com cookies help Meta track whether users complete specific actions after interacting with an ad (e.g., clicking a link or making a purchase) and provide analytic metrics that advertisers use to measure ad campaign performance. For example, the Rent-a-Center Website causes the following data to be sent to Meta when the user visits the "Living Rooms" page on the Rent-a-Center Website:

| Key | Value |
| --- | --- |
| id | 351141539063359 |
| ev | PageView |
| dl | https://www.rentacenter.com/en/furniture/living-rooms/c/1001 |
| rl | https://www.rentacenter.com/ |
| if | false |
| ts | 1718650874733 |
| sw | 1920 |
| sh | 1080 |
| v | 2.9.158 |
| r | stable |
| ec | 0 |
| o | 4126 |
| fbp | fb.1.1718650864822.699587610991946959 |
| ler | empty |
| cdl | API_unavailable |
| it | 1718650874389 |
| coo | false |
| eid | 9e4acca5-1a2b-4f82-893d-fb315917cfb3 |
| rqm | GET |

45.     Data transmissions to Meta include cookies. For example, the following cookies were sent to Meta along with a button click event:

CLASS ACTION COMPLAINT

| Key | Value |
|---|---|
| sb | pQI9ZkmdCAXYrQSQXngSSMep |
| datr | pQI9Zu6rOGZxJLTz7YrqaTVV |
| c_user | 100076133960803 |
| ps_n | 1 |
| xs | 11%3Adi1FNrtx5ix0HA%3A2%3A1715274410%3A-1%3A-1%3A%3AA cWB7hRVs9aUx4IKTVQLqWPG-oCweCOgpxKZqg8Oyw |
| fr | 1zHnujAsCJ0QsOxGc.AWUf14X4EsT-CeuB3Plof5mejQM.BmaJDh..AAA.0.0.BmaJDh.AWVEcTeM_gE |

46.     The c_user cookie shown above enables Facebook to identify a specific user when they are logged in to their account. The c_user cookie stores a user's unique ID, which is associated with their Facebook profile. This ID enables Facebook to track user interactions on its platform and across sites that use Facebook plugins, such as adding items to a cart, clicking "Like" buttons, or engaging with comment sections. When combined with other data sent to the Facebook domain, this cookie allows Meta to track users' browsing activities. Facebook uses this data for various purposes, such as personalizing content, enhancing ad targeting accuracy, and refining its user experience.

47.     In particular, by identifying users who have shown interest in certain products or content, the facebook.com cookies enable Meta's advertising platform to enable advertisers to show relevant ads to those users when they visit other websites within Meta's ad network.[4] These cookies allow Meta to collect data on how users interact with websites, regardless of whether they have a Facebook account or are logged in.[5]

48.     Further, along with all of this data, the Faecbook software code that Defendants cause to be stored on and executed by the user's device causes the user's "user-agent" information to be sent to Meta. For example:

| user-agent | Mozilla/5.0 (Windows NT 10.0; Win64; x64) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/ 125.0.0.0 Safari/537.36 |
|---|---|

---

[4] *Id.*; https://allaboutcookies.org/what-data-does-facebook-collect.

[5] https://allaboutcookies.org/what-data-does-facebook-collect.

CLASS ACTION COMPLAINT

49.     Here, the user-agent value of "Mozilla/5.0 (Windows NT 10.0; Win64; x64) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/130.0.0.0 Safari/537.36" corresponds to the Chrome browser, version 130, on Windows 10.[6]

50.     The facebook.com cookies allow Meta to obtain and store at least the following user data: (i) browsing history, (ii) visit history, (iii) website interactions, (iv) user input data, (v) demographic information, (vi) interests and preferences, (vii) shopping behaviors, (viii) device information, (ix) referring URLs, (x) session information, (xi) user identifiers, and (xii) geolocation data (including IP addresses).[7]

51.     Meta utilizes the data collected through the facebook.com cookies for its own purposes, including by using the data to tailor content and target advertisements to users. This includes practices such as (i) **Ad Targeting and Retargeting**, in which Meta uses the facebook.com cookie to track users' online behavior across different sites, building a profile based on their browsing habits, purchases, and interactions. This profile enables Facebook to deliver highly targeted ads within the Facebook ecosystem and on other sites that are part of Facebook's Audience Network; (ii) **Conversion Tracking**, in which Meta uses the facebook.com cookie to enable business partners to track specific actions users take after viewing or clicking on a Facebook ad, such as making a purchase or signing up for a newsletter; (iii) **Audience Insights and Analytics**, in which Meta uses the facebook.com cookie to provide data to businesses on user demographics, interests, and behaviors across their sites and apps; and (iv) **Cross-Device and Cross-Platform Tracking**, in which Meta uses the facebook.com cookie to support tracking users across devices and platforms, so that ads are targeted consistently regardless of the device a user is on. This ensures that advertisers can follow users across devices.

---

[6] There are many tools on the web that are capable of parsing user-agent strings to determine what browser and operating system they pertain to. One such tool is located at https://explore.whatismybrowser.com/useragents/parse.

[7] *Id.*

## 2.   Google Cookies

52.     Defendants cause third party cookies to be transmitted to and from Website users' browsers and devices, even after users decline cookies (including Necessary, Analytics and Marketing cookies) to and from the **google-analytics.com; google.com; adservice.google.com; google.com; and doubleclick.net** domains. Each of these domains is associated with Google LLC's digital advertising and analytics platform that collects user information via cookies to assist Google in performing data collection, behavioral analysis, user retargeting, and analytics.[8] Google serves targeted ads to web users across Google's ad network, which spans millions of websites and apps. Nearly 20% of web traffic is tracked by Google's DoubleClick cookies.[9] Google's cookies help it track whether users complete specific actions after interacting with an ad (e.g., clicking a link or making a purchase) and provide analytic metrics that advertisers use to measure ad campaign performance. Further, by identifying users who have shown interest in certain products or content, Google's cookies enable its advertising platform to enable advertisers to show relevant ads to those users when they visit other websites within Google's ad network.[10]

53.     Specifically, Google sends cookies when a web user visits a webpage that shows Google Marketing Platform advertising products and/or Google Ad Manager ads.[11] "Pages with Google Marketing Platform advertising products or Google Ad Manager ads include ad tags that instruct browsers to request ad content from [Google's] servers. When the server delivers the ad

---

[8] *See* Our advertising and measurement cookies (available at https://business.safety.google/adscookies/).

[9] *See, e.g.* https://www.ghostery.com/whotracksme/trackers/doubleclick.

[10] *See, e.g.* About cross-channel remarketing in Search Ads 360 (available at https://support.google.com/searchads/answer/7189623?hl=en); About dynamic remarketing for retail (available at https://support.google.com/google-ads/answer/6099158?hl=en&sjid=1196213575075458908-NC).

[11] *See* How Google Marketing Platform advertising products and Google Ad Manager use cookies (available at https://support.google.com/searchads/answer/2839090?hl=en&sjid=1196213575075458908-NC); *see also* Cookies and user identification (available at https://developers.google.com/tag-platform/security/concepts/cookies).

content, it also sends a cookie. But a page doesn't have to show Google Marketing Platform advertising products or Google Ad Manager ads for this to happen; it just needs to include Google Marketing Platform advertising products or Google Ad Manager ad tags, which might load a click tracker or impression pixel instead." *Id.* As Google explains, "Google Marketing Platform advertising products and Google Ad Manager send a cookie to the browser after any impression, click, or other activity that results in a call to our servers." *Id.*

54.    Google also uses cookies in performing analytical functions. As Google explains, "Google Analytics is a platform that collects data from [] websites and apps to create reports that provide insights into [] business[es]."[12] "To measure a website … [one] add[s] a small piece of JavaScript measurement code to each page on [a] site." *Id.* Then, "[e]very time a user visits a webpage, the tracking code will collect … information about how that user interacted with the page." *Id.* Google Analytics enables website owners to "measure when someone loads a page, clicks a link, [] makes a purchase;" "completes a purchase"; "searches [] website or app"; "select content on [] website or app"; "views an item"; and "views their shopping cart."[13]

55.    Google's cookies allow it to obtain and store at least the following user data: (i) browsing history, (ii) visit history, (iii) website interactions, (iv) user input data, (v) demographic information, (vi) interests and preferences, (vii) shopping behaviors, (viii) device information, (ix) referring URLs, (x) session information, (xi) user identifiers, and (xii) geolocation data.[14]

---

[12] How Google Analytics Works (available at https://support.google.com/analytics/answer/12159447?hl=en).

**[13]** Set up events (available at https://developers.google.com/analytics/devguides/collection/ga4/events); and Recommended events (available at https://developers.google.com/analytics/devguides/collection/ga4/events).

[14] *See* About the Google Tag (available at https://support.google.com/searchads/answer/7550511?hl=en); How Floodlight Recognizes Users (available at https://support.google.com/searchads/answer/2903014?hl=en); How Google Ads tracks website conversions (available at https://support.google.com/google-ads/answer/7521212); Google Ads Help, Cookie: Definition (available at https://support.google.com/google-ads/answer/2407785?hl=en); About demographic targeting in Google Ads (available at https://support.google.com/searchads/answer/7298581?hl=en&sjid=1196213575075458908-

CLASS ACTION COMPLAINT

56.     For example, the Google software code that Defendants cause to be stored on and executed by the Rent-a-Center Website user's device causes the following data to be sent to Google's domain, at https://stats.g.doubleclick.net:

| Key | Value |
| --- | --- |
| t | dc |
| aip | 1 |
| _r | 3 |
| v | 1 |
| _v | j101 |
| tid | UA-75793694-1 |
| cid | 947313934.1718650783 |
| jid | 1129114274 |
| gjid | 1213044262 |
| _gid | 748644263.1718650881 |
| _u | aDjAgUArAAAAAGANKAC~ |
| z | 1244010626 |

57.     The "cid" cookie above refers to "Client ID." It contains a unique identifier for the user's browser and device, that enables Google to link the user to their interactions with the website.[15] The "jid" is the "JoinID," which binds the Google Analytics cookie to the cookie for DoubleClick, which is Google's advertising platform. *Id.*

58.     Along with this data, the Google software code that Defendants cause to be stored on and executed by the user's device causes the following cookies to be sent to Google's domain:

| Key | Value |
| --- | --- |
| ar_debug | 1 |
| IDE | AHWqTUmwDlocjvCui8pHhuZ0zd4Au0599nzvKmAQIZMNyOEGIb9th Wpd_QFOCR_Aw98 |
| receive-cookie-deprecation | 1 |

---

NC&visit_id=638670675669576522-2267083756&ref_topic=7302618&rd=1); How Google Analytics Works (https://support.google.com/analytics/answer/12159447); Set up events (available at https://developers.google.com/analytics/devguides/collection/ga4/events); and Recommended events (available at https://support.google.com/analytics/answer/9267735).

[15] *See, e.g.*, https://cheatography.com/dmpg-tom/cheat-sheets/google-universal-analytics-url-collect-parameters/; https://www.analyticsmarket.com/blog/how-google-analytics-collects-data/; https://www.owox.com/blog/use-cases/google-analytics-client-id/

CLASS ACTION COMPLAINT

59.     Google uses the "DSID" cookie to "identify a signed-in user on non-Google sites."[16] The "IDE" cookie is used "to personalize the ads [users] see" and "to show Google ads on non-Google sites."[17]

60.     Further, along with all of this data, the Google software code that Defendants cause to be stored on and executed by the user's device causes the user's "user-agent" information to be sent to Google. For example, the user-agent value of "Mozilla/5.0 (Windows NT 10.0; Win64; x64) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/130.0.0.0 Safari/537.36" corresponds to the Chrome browser, version 130, on Windows 10.[18]

61.     Finally, the data sent to Google contains the user's IP address.

62.     Because Google's cookies operate across multiple sites (i.e., cross-site tracking), the cookie enables Google to track users as they navigate from one site to another, and to comprehensively observe and evaluate user behavior online. Google's advertising platform aggregates user data to create consumer profiles containing detailed information about a consumer's behavior, preferences, and demographics and audience segments based on shared traits (such as females, Millennials, etc.), and to perform targeted advertising and marketing analytics.

63.     Thus, the Google cookies used on the Websites enable Google to track users' interactions with advertisements to help advertisers understand how users engage with ads across different websites. Further, the user data collected through the cookie enables the delivery of personalized ads based on user interests and behaviors. For instance, if a user frequently visits travel-related websites, Google will show her more travel-related advertisements. Further, the collected data is used to generate reports for advertisers, helping them assess the performance of their ad campaigns and make data-driven decisions (such as renaming their products). Further, Google's advertising platform enables advertisers to retarget marketing, which Google explains

---

[16] https://policies.google.com/technologies/cookies?hl=en-US

[17] *Id.*

[18] There are many tools on the web that are capable of parsing user-agent strings to determine what browser and operating system they pertain to. One such tool is located at https://explore.whatismybrowser.com/useragents/parse.

allows advertisers to "show previous visitors ads based on products or services they viewed on your website. With messages tailored to your audience, dynamic remarketing helps you build leads and sales by bringing previous visitors back to your website to complete what they started."[19]

64.    Further, in its "Shared Data Under Measurement Controller-Controller Data Protection Terms," Google states: "Google can access and analyze the Analytics data customers share with us to better understand online behavior and trends, and improve our products and services—for example, to improve Google search results, detect and remove invalid advertising traffic in Google Ads, and test algorithms and build models that power services like Google Analytics Intelligence that apply machine-learning to surface suggestions and insights for customers based on their analytics data and like Google Ads that applies broad models to improve ads personalization and relevance. These capabilities are critical to the value of the products we deliver to customers today."[20] Thus, Google can have the capability to use the data it collects for understanding online behavior and trends, machine learning, and improving its own products and services.

### 3.    TikTok Cookies

65.    Defendants also cause third party cookies to be transmitted to and from Website users' browsers and devices, even after users elect to decline cookies, to and from the **analytics.tiktok.com** domain. This domain is associated with TikTok for Buisness, a suite of tools offered by TikTok, a social media platform owned by ByteDance Ltd., known for short-form video sharing. [21] The TikTok platform is used to create and share videos, and it utilizes cookies for various purposes including assisting brands and marketers to create, manage, and optimize ad campaigns on the platform.[22]

---

[19] Dynamic remarketing for web setup guide (available at https://support.google.com/google-ads/answer/6077124).

[20] Shared Data Under Measurement Controller-Controller Data Protection Terms (available at https://support.google.com/analytics/answer/9024351).

[21] *See* Our advertising and measurement cookies (available at https://business.safety.google/adscookies/).

[22] *See, e.g.,* TikTok for Business (https://ads.tiktok.com/business/en-US/products/ads; and https://ads.tiktok.com/business/en-US/products/measurement); TikTok Business Help Center; Using Cookies with

66.    TikTok utilizes **analytics.tiktok.com** cookies to collect data on user interactions with websites that have integrated TikTok's tracking technologies (such as the Website). These cookies are used to "measure and improve the performance of your advertising campaigns and to personalize the user's experience (including ads) on TikTok."[23] TikTok further explains that it uses cookies to "match events with people who engage with your content on TikTok. Matched events are used to improve measurement and optimize ad campaigns. They can also contribute to building your retargeting and engagement audiences." *Id.* These cookies enable TikTok to recognize and track users across different sessions and domains (i.e., cross-site tracking) and to collect and synchronize user data to observe and evaluate TikTok user behavior.

67.    These cookies enable TikTok to obtain and store at least the following user data: (i) browsing history, (ii) visit history, (iii) website interactions, (iv) user input data, including *email addresses and phone numbers*; (v) demographic information, (vi) interests and preferences, (vii) shopping behaviors, (viii) device information, (ix) session information, (x) user identifiers, and (xi) geolocation data in the form of the IP address.[24]

68.    For example, the TikTok software code that Defendants cause to be stored on and executed by the Website user's device causes data to be sent to TikTok's domain, at https://analytics.tiktok.com. The data contains information regarding the user's visit to the website, such as URLs visited, buttons clicked, and other events. For example, the following "Pageview" event sent to TikTok shows that the user visited the "Living Rooms" page on the Rent-a-Center Website:

---

TikTok Pixel (available at https://ads.tiktok.com/help/article/using-cookies-with-tiktok-pixel?lang=en).

[23] TikTok Business Help Center; Using Cookies with TikTok Pixel (available at https://ads.tiktok.com/help/article/using-cookies-with-tiktok-pixel?lang=en).

[24] *Id.*; *see also* TikTok for Business: Enhance Data Postback with the TikTok Pixel (https://ads.tiktok.com/help/article/enhance-data-postback-with-the-tiktok-pixel?lang=en); TikTok for Business: Advanced Matching for Web (available at https://ads.tiktok.com/help/article/advanced-matching-web?redirected=1); TikTok for Business: About TikTok Pixel (available at https://ads.tiktok.com/help/article/tiktok-pixel?lang=en).

CLASS ACTION COMPLAINT

```
1   {
2       "event": "Pageview",
3       "event_id": "",
4       "message_id": "messageId-1718650875084-3001797022206-
    CIS47BRC77U0A5OSPHQG",
5       "is_onsite": false,
6       "timestamp": "2024-06-17T19:01:15.085Z",
7       "context": {
8           "ad": {
9               "sdk_env": "external",
10              "jsb_status": 2
11          },
12          "device": {
13              "platform": "pc"
14          },
15          "user": {
16              "anonymous_id": "zHi6hMWcTSySmoRrJetpvd6gkBk"
17          },
18          "pixel": {
19              "code": "CIS47BRC77U0A5OSPHQG",
20              "runtime": "1"
21          },
22          "page": {
23              "url":
    "https://www.rentacenter.com/en/furniture/living-
    rooms/c/1001",
24              "referrer": "https://www.rentacenter.com/",
25              "load_progress": "1"
26          },
27          "library": {
28              "name": "pixel.js",
29              "version": "2.2.0"
30          },
31          "session_id": "c1017186-2cdb-11ef-9e8d-
    b8cef60d9cca::u6ENJdJk47WGnUPreUM_-CIS47BRC77U0A5OSPHQG",
32          "pageview_id": "pageId-1718650875064-4657735674758.1.0-
    CIS47BRC77U0A5OSPHQG",
33          "variation_id": "test_2_single_track",
```

CLASS ACTION COMPLAINT

```
34        "userAgent": "Mozilla/5.0 (Windows NT 10.0; Win64; x64)
          AppleWebKit/537.36 (KHTML, like Gecko) Chrome/125.0.0.0
          Safari/537.36"
35    },
36    "_inspection": {},
37    "properties": {},
38▼   "signal_diagnostic_labels": {
39▼      "raw_email": {
40          "label": "missing"
41      },
42▼      "raw_auto_email": {
43          "label": "missing"
44      },
45▼      "raw_phone": {
46          "label": "missing"
47      },
48▼      "raw_auto_phone": {
49          "label": "missing"
50      },
51▼      "hashed_email": {
52          "label": "missing"
53      },
54▼      "hashed_phone": {
55          "label": "missing"
56      }
57    }
58 }
```

69.    The data includes the "session_id," which is a unique identifier generated by TikTok to track a user's activity. This allows TikTok to correlate the user's behavior from a browsing session, including page views and conversions, to a particular user to enhance advertising measurement, attribution, and targeting.[25]

70.    This data also includes the user's "user-agent" information. As discussed above with respect to Google, the "user-agent" corresponds to the device and browser that the user has used to access the Website.

71.    Along with this and other data, the TikTok software code that Defendants cause to be stored on and executed by the user's device causes the "_ttp" cookie to be sent to TikTok's domain:

| Key  | Value                      |
|------|----------------------------|
| _ttp | 2gEzz0WpWUXeLJkhLzw5UHO1IDW |

---

[25] *See, e.g.*, How to get TikTok session id? (available at https://gbtimes.com/how-to-get-tiktok-session-id/).

CLASS ACTION COMPLAINT

72.     According to TikTok's documentation, the "_ttp" cookie is one of the company's advertising cookies, the purpose of which is "[t]o measure and improve the performance of your advertising campaigns and to personalize the user's experience (including ads) on TikTok."[26]

73.     Finally, the data sent to TikTok includes the user's IP address.

74.     By collecting this user data, TikTok performs user behavior tracking, i.e., monitoring user actions like page views, clicks, and interactions to understand user engagement; advertising optimization, i.e., gathering data to enhance the relevance and effectiveness of TikTok advertising campaigns; and performance measurement (i.e., assessing the success of marketing efforts by analyze user responses to ads and content).[27]

75.     Further, TikTok's Automatic Advanced Matching feature functions as follows: "When a visitor lands on your website and inputs customer information during registration, sign-in, contact, or checkout on a website where you installed your pixel, Automatic Advanced Matching will capture information from those fields. …TikTok will use hashed information to link event information to people on TikTok. Tiktok may use matched events to better attribute events to TikTok ads, optimize advertisers' future campaigns, and depending on advertisers' and users' settings, TikTok may also add people to advertisers' retargeting or engagement audiences."[28]

### 4.    Adobe Cookies

76.     Defendant also causes third party cookies to be transmitted to and from Website users' browsers and devices, even after users elect to opt out of cookies, to and from the **demdex.net** domain, which is associated with Adobe Inc.'s Audience Manager, a data management platform.

---

[26] *See* TikTok for Business: Using Cookies with TikTok Pixel
(available at https://ads.tiktok.com/help/article/using-cookies-with-tiktok-pixel?lang=en).

[27] *See* TikTok for Business: Using Cookies with TikTok Pixel
(available at https://ads.tiktok.com/help/article/using-cookies-with-tiktok-pixel?lang=en).

[28] TikTok for Business: How to set up Automatic Advanced Matching (available at
https://ads.tiktok.com/help/article/how-to-set-up-automatic-advanced-matching?lang=en).

CLASS ACTION COMPLAINT

77.    These cookies are used to assign a unique identifier to each site visitor, which enables Adobe to consistently recognize and track users across different sessions and domains (i.e., cross-site tracking) and collect and synchronize user data to comprehensively observe and evaluate user behavior online.[29] These cookies enable Adobe to obtain and store at least the following user data: (i) user identifier; (ii) website interactions; (iii) browsing history; (iv) visit history; (v) interests and preferences; and (vi) session information.[30]

78.    Adobe aggregates this cookie data with other data from multiple channels and devices, including web analytics, CRM systems, and e-commerce platforms, to create consumer profiles containing detailed information about a consumer's behavior, preferences, and demographics, create audience segments based on shared traits (such as millennials, tech enthusiasts, etc.), and to enable targeted advertising and marketing analytics.[31]

79.    As with all other internet requests, the user-agent and IP address corresponding to the user are sent to Adobe along with the aforementioned requests.

### 5.    Microsoft Bing Cookies

80.    Defendant also causes third party cookies to be transmitted to and from Website users' browsers and devices, even after users elect to reject non-strictly necessary cookies, to and from the **bat.bing.com** domain. "The webpage bat.bing.com is a host for Bing Ads Conversion tracking code. This webpage is owned by Microsoft[.]"[32] The domain is associated

---

[29] *See, e.g.,* Adobe Experience League: Adobe Analytics cookies (available at https://experienceleague.adobe.com/en/docs/core-services/interface/data-collection/cookies/analytics); *see also* Adobe Experience League: Audience Manager cookies (available at https://experienceleague.adobe.com/en/docs/core-services/interface/data-collection/cookies/audience-manager).

[30] *See, e.g.,* Adobe Audience Manager User Guide: Data Collection Components (available at https://experienceleague.adobe.com/en/docs/audience-manager/user-guide/reference/system-components/components-data-collection).

[31] *See, e.g.,* Adobe Audience Manager User Guide: Understanding Calls to the Demdex Domain (available at https://experienceleague.adobe.com/en/docs/audience-manager/user-guide/reference/demdex-calls); Adobe Experience Cloud Identity Service overview (available at https://experienceleague.adobe.com/en/docs/id-service/using/intro/overview); Adobe Audience Manager Features (available at https://business.adobe.com/products/audience-manager/features.html); *see also* Audience Manager Overview (available at https://experienceleague.adobe.com/en/docs/audience-manager/user-guide/overview/aam-overview).

[32] https://answers.microsoft.com/en-us/msadvs/forum/all/does-batbing-track-your-browser-searches-and-sites/0a402f00-60c2-4d54-bd7d-81b67ccc7f13.

CLASS ACTION COMPLAINT

with Bing, Microsoft's search engine, as well as Microsoft's digital advertising and analytics platforms. When a webpage loads a bat.bing.com cookie, it "tells Microsoft Advertising about the user visits to [the] webpage."[33] Microsoft uses bat.bing.com cookies to "record[] what customers do on [a] website and send[] that information to Microsoft Advertising." [34] Microsoft then serves targeted ads to web users across its extensive ad networks, which utilizes its "rich" supply of gathered data to "reach more than a billion people[.]"[35]

81.    Bat.bing.com cookies collect consumers' (i) search history and browsing history, (ii) visit history, (iii) website interactions, (iv) user input data, (v) demographic information (including zip code[36]; gender[37]; age[38] (including identifying whether that person is a minor or not)); (vi) interests and preferences, (vii) shopping behaviors, (viii) device information, (ix) referring URLs, (x) session information, (xi) user identifiers, and (xii) geolocation data (including IP addresses). Bat.bing.com updates this information each time a user clicks on a website hosting a third-party bat.bing.com cookie.

82.    Bat.bing.com cookies help Microsoft track users' interactions with ads (e.g., clicking a link or making a purchase) and provide valuable metrics that advertisers use to measure ad campaign performance. Further, bat.bing.com cookies allow Microsoft to obtain and store at user data to "help [website owners] focus a campaign or ad group on potential audiences who meet [website owners'] specific criteria, so [website owners] can increase the chance that [consumers] see [website owners'] ads." [39] Further, bat.bing.com offers [website owners] valuable "conversion tracking," which is a "measure [of] the ROI (return on investment) of your

---

[33]https://help.ads.microsoft.com/apex/index/3/en/56959#:~:text=The%20most%20important%20request%20is,making%20when%20your%20webpage%20loads.

[34] https://help.ads.microsoft.com/#apex/ads/en/56960/1.

[35] https://answers.microsoft.com/en-us/msadvs/forum/all/opt-out-of-audience-ads/753bc0fc-c04f-4e20-a94a-abaa950ccf31#:~:text=When%20you%20come%20to%20Microsoft,and%20rich%20first%2Dparty%20data.

[36] https://help.ads.microsoft.com/#apex/ads/en/60212/0.

[37] *Id*.

[38] *Id*.

[39] https://help.ads.microsoft.com/#apex/ads/en/60212/0.

advertising campaign by letting [website owners] assign a monetary value to the activities people complete on [Defendant's] website after clicking [website owners'] ad."[40]

83.     Microsoft also utilizes bat.bing.com data for its own purposes, including by using the data to tailor content and target advertisements to users. This profile enables Microsoft to deliver highly targeted ads within Microsoft's extensive advertising network Microsoft's revenue from its advertising network program has exceeded $10 billion as of 2022.[41]

### 6.     Additional Third Party Cookies

84.     Defendants also cause third party cookies to be transmitted to and from Website users' browsers and devices, even after users elect to decline cookies, to and from other third party domains, including Yahoo, Salesforce, Pubmatic, Stickyadstv.com, Contextual.media.net, Termorhub.com, Addthis.com, Adnxs.com, Mediavine.com, Rfihub.com, Pippio.com, Openx.net, Bidswitch.net, Casalemedia.com, Lightboxcdn.com, Potrelease.com, Sitescout.com, Eyeota.net, Liadm.com, Rezync.com, Eversttech.net, Agkn.com, Rlcdn.com, Bluekai.com, and more

85.     The **ib.adnxs.com** domain is associated with AppNexus, owned by Microsoft. Microsoft uses adnxs.com cookies to collect data on user navigation and behavior on websites including information on user preferences and/or interaction with web-campaign content. The cookies include unique identifiers that help Microsoft recognize users across different websites and sessions. This enables advertisers to track the effectiveness of campaigns and avoid showing the same ads repeatedly to the same users. Microsoft uses this data to personalize ad content and track users across the internet. Adnxs.com cookies also categorize users into different segments based on their interests, demographics, or behaviors. This segmentation is used to target specific audiences with tailored ads.

86.     The **pubmatic.com** domain (and its subdomains) is associated with PubMatic, Inc., a digital advertising company.[42] PubMatic uses pubmatic.com cookies to collect data on

---

[40] https://help.ads.microsoft.com/#apex/ads/en/56680/2.

[41] https://digiday.com/media/microsofts-ad-revenue-hit-10b-and-its-investing-is-a-sleeping-giant-about-to-wake/.

[42] *See* www.metrixlab.com.

user behavior on websites including user interactions with advertising content.[43] PubMatic uses this data to personalize advertising content and track users across the internet.[44]

87.     The **insight.adsrvr.org** domain is associated with The Trade Desk, Inc., a digital advertising company that offers a cloud-based ad-buying platform that enables businesses to plan, manage, optimize, and measure data-driven digital advertising campaigns.[45] The Trade Desk uses insight.adsrvr.org cookies to collect data on users such as their geographic locations, the type of device users are using, and users' interests as inferred from their web browsing or app usage activity."[46] This data helps The Trade Desk personalize ad content and track users across the internet.[47]

88.     The Trade Desk acknowledges that its cookies' ability "to collect, augment, analyze, use and share data relies upon the ability to uniquely identify devices across websites and applications, and to collect data about user interactions with those devices for purposes such as serving relevant ads and measuring the effectiveness of ads."[48]

89.     The **ps.eyeota.net** domain is associated with Eyeota, a subsidiary of Dun & Brandstreet, a "Leading Business Data Analytics" firm.[49] Eyeota's cookies collect data associated with a user's browser history, as well as anything a visitor interacts with on a particular website page. Eyeota uses the collected data to target users with personalized advertisements, as well as collate data to sell to other businesses to help companies drive growth, manage risk, and strengthen the performance of their business.

90.     The **scorecardresearch.com** domain is associated with Comscore, Inc.'s Scorecard Research service, a "leading global market research effort that studies and reports on

---

[43] *See*, PubMatic, Inc. Form 10-K for year ending December 31, 2023 (Filed February 28, 2024) at 17–18.

[44] *Id.*

[45] *See* The Trade Desk, Inc. 2023 Form 10-K (filed February, 15 2024).

[46] *Id.*

[47] *Id.*

[48] *Id.*

[49] Dun & Bradstreet solutions (available at https://www.dnb.com/).

CLASS ACTION COMPLAINT

Internet trends and behavior."[50] The ds.scorecardresearch.com domain collects a user's online identifiers, ("e.g., cookie identifiers, other hardware or device identifiers, and IP addresses"), geolocation data, browsing history, operating system, browser type, website preferences, and the duration and time of the user's website access.[51] Scorecard Research then processes "the information collected . . . to draw inferences about your predicted characteristics and preferences,"[52] which it then sells to businesses "around the world."[53] Scorecard Research then sells this collected data to website owners for a profit.

91.    The **everesttech.net** subdomain is associated with Everest Technologies, Inc., a technology company that offers DevOps,  Automation, and  Decision Intelligence ("Combine the power of Analytics, Machine Learning and AI") services."[54] The cm.everesttech.net domain collects a user's log and usage data ("IP address, device information, browser type and settings and information about your activity on the website . . . [and] pages and files viewed, searches and other actions you take such as what features you use [on the website]."[55] While Everest uses some of this data for IT management and tech support, it also uses the data collected for targeted advertising.

92.    These cookies allow these Third Parties to obtain and store at least the following user data: (i) browsing history, (ii) visit history, (iii) website interactions, (iv) demographic information, (v) interests and preferences, (vi) shopping behaviors, (vii) device information, (viii) referring URLs, (ix) session information, (x) user identifiers, and/or (xi) geolocation data.

---

[50] ScorecardResearch website (available at https://www.scorecardresearch.com/).

[51] ScorecardResearch Privacy Policy (last updated June 1, 2023) (available at https://www.scorecardresearch.com/privacy.aspx?newlanguage=1).

[52] Id.

[53] ScorecardResearch About page (available at https://www.scorecardresearch.com/about.aspx?newlanguage=1).

[54] https://www.everesttech.com/services/?c=us

[55] Id.

CLASS ACTION COMPLAINT

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

D.    **The Private Communications Collected is Valuable.**

93.    The Personal Communications that the Third Parties track and collect by way of the cookies on the Websites is valuable to Defendants as well as the Third Parties. Defendants can use the data to create and analyze the performance of marketing campaigns, website design, product placement, and target specific users or groups of users for advertisements. For instance, if Defendants wanted to market certain products to consumers, Defendants could use the data collected by the Third Parties to monitor users who visit webpages related to specific products, then advertise similar products to those particular users when they visit other webpages. The third-party cookies also enable Defendants to target online advertisements to users when they visit *other* websites, even those completely unrelated to Defendants and their products.

94.    Data about users' browsing history enables Defendants to spot patterns in users' behavior on the Websites and their interests in, among other things, Defendants' rent-to-own products. On a broader scale, it enables Defendants to gain an understanding of trends happening across their brands and across the consumer goods and rent-to-own markets. All of this helps Defendants further monetize the Websites and maximize revenue by collecting and analyzing user data.

95.    The value of the Private Communications tracked and collected by the Third Parties using cookies on the Websites can be quantified. Legal scholars observe that "[p]ersonal information is an important currency in the new millennium."[56] Indeed, "[t]he monetary value of personal data is large and still growing, and corporate America is moving quickly to profit from the trend." *Id*. "Companies view this information as a corporate asset and have invested heavily in software that facilitates the collection of consumer information." *Id*.

96.    Numerous empirical studies quantify the appropriate value measure for personal data. Generally, the value of personal data is measured as either the consumer's willingness to accept compensation to sell her data or the consumer's willingness to pay to protect her information.

---

[56] *See* Paul M. Schwartz, *Property, Privacy and Personal Data*, 117 Harv. L. Rev. 2055, 2056–57 (2004).

97.     Through their false representations and aiding, agreeing with, employing, permitting, or otherwise enabling the Third Parties to track users' Private Communications on the Websites using third-party cookies, Defendants are unjustly enriching themselves at the cost of consumer privacy and choice, when the consumer could otherwise have the ability to choose if and how they would monetize their data.

**PLAINTIFFS' EXPERIENCES**

**Plaintiff Gabrielli**

98.     Plaintiff Gabrielli visited the Rent-A-Center Website to browse information about Defendants' products on one or more occasions during the last four years, including, on or around June 2024.

99.     When Plaintiff Gabrielli visited the Rent-A-Center Website, the Rent-A-Center Website immediately presented him with Defendants' popup cookie consent banner, which provided the option to select the "Decline" cookies link. Plaintiff Gabrielli viewed Defendants' representation on the popup cookie consent banner that, "We use cookies to give you the best experience! We use cookies on our website. By clicking "Accept", you consent to the use of all the cookies according to our Cookie Policy." Plaintiff Gabrielli also viewed Defendants' additional representation that users could "Decline" cookies.

100.     Consistent with his typical practice in rejecting or otherwise declining the placement or use of cookies and tracking technologies, Plaintiff Gabrielli selected and clicked the "Decline" cookies link. Plaintiff Gabrielli believed that selecting the "Decline" cookies link on the popup cookie consent banner found on the Rent-A-Center Website would allow him to opt out of, decline, and/or reject all cookies and other tracking technologies (inclusive of Necessary, Analytics and Marketing cookies).

101.     In selecting the "Decline" cookies link, Plaintiff Gabrielli gave Defendants notice that he did not consent to the use or placement of cookies and tracking technologies while browsing the Rent-A-Center Website. Further, Plaintiff Gabrielli specifically rejected, based on Defendants' representations, Necessary, Analytics and Marketing cookies and those cookies that

share information with third parties. In reliance on these representations and promises, only then did Plaintiff Gabrielli continue browsing the Rent-A-Center Website.

102.   Even before the popup cookie consent banner appeared on the screen, Defendants nonetheless caused cookies and tracking technologies, including Necessary, Analytics and Marketing cookies, to be placed on Plaintiff Gabrielli's device and/or transmitted to the Third Parties along with user data, without Plaintiff Gabrielli's knowledge. Accordingly, the popup cookie consent banner's representation to Plaintiff Gabrielli that he could decline/reject the use and/or placement of cookies and tracking technologies while he browsed the Rent-A-Center Website was false. Contrary to what Defendants made Plaintiff Gabrielli believe, he did not have a choice about whether third-party cookies would be placed on his device and/or transmitted to the Third Parties along with his user data; rather, Defendants had already caused that to happen.

103.   Then, as Plaintiff Gabrielli continued to browse the Rent-A-Center Website in reliance on the promises Defendants made in the cookie consent banner, and despite Plaintiff Gabrielli's clear declination/rejection of the use and/or placement of such cookies and tracking technologies, Defendants nonetheless continued to cause the placement and/or transmission of cookies along with user data, including Necessary, Analytics and Marketing cookies from the Third Parties on his device. In doing so, Defendants permitted the Third Parties to track and collect Plaintiff Gabrielli's Private Communications as he browsed the Rent-A-Center Website.

104.   Defendants' representations that consumers could "Decline" cookies while Plaintiff Gabrielli and users browsed the Websites, or at least those Necessary, Analytics and Marketing cookies, were untrue. Had Plaintiff Gabrielli known this fact, he would not have used the Rent-A-Center Website. Moreover, Plaintiff Gabrielli reviewed the popup cookie consent banner and Cookie Policy prior to using the Rent-A-Center Website. Had Defendants disclosed that they would continue to cause cookies and tracking technologies to be stored on consumers' devices even after they choose to decline cookies, Plaintiff Gabrielli would have noticed it and would not have used the Rent-A-Center Website or, at a minimum, he would have interacted with the Rent-A-Center Website differently.

105.    Plaintiff Gabrielli continues to desire to browse content featured on the Websites. Plaintiff Gabrielli would like to browse websites that do not misrepresent that users can decline/reject cookies and tracking technologies. If the Websites were programmed to honor users' requests to decline cookies and tracking technologies, Plaintiff Gabrielli would likely browse the Rent-A-Center Website again in the future, but will not do so until then. Plaintiff Gabrielli regularly visits websites that feature content similar to that of the Websites. Because Plaintiff Gabrielli does not know how the Websites are programmed, which can change over time, and because he does not have the technical knowledge necessary to test whether the Websites honors users' requests to decline cookies and tracking technologies, Plaintiff Gabrielli will be unable to rely on Defendants' representations when browsing the Websites in the future absent an injunction that prohibits Defendants from making misrepresentations on the Websites. The only way to determine what network traffic is sent to third parties when visiting a website is to use a specialized tool such as Chrome Developer Tools. As the name suggests, such tools are designed for use by "developers" (i.e., software developers), whose specialized training enables them to analyze the data underlying the HTTP traffic to determine what data, if any, is being sent to whom. Plaintiff Gabrielli is not a software developer and has not received training with respect to HTTP network calls.

**Plaintiff Ayala**

106.    Plaintiff Ayala visited the Rent-A-Center Website to browse information about Defendants' products on multiple occasions during the last four years.

107.    When Plaintiff Ayala visited the  Rent-A-Center Website, the Website immediately presented him with Defendants' popup cookie consent banner, which provided the option to select the "Decline" cookies link. Plaintiff Ayala viewed Defendants' representation on the popup cookie consent banner that, "We use cookies to give you the best experience! We use cookies on our website. By clicking "Accept", you consent to the use of all the cookies according to our Cookie Policy." Plaintiff Ayala also viewed Defendants' additional representation that users could "Decline" cookies.

CLASS ACTION COMPLAINT

108.    Consistent with his typical practice in rejecting or otherwise declining the placement or use of cookies and tracking technologies, Plaintiff Ayala selected and clicked the "Decline" cookies link. Plaintiff Ayala believed that selecting the "Decline" cookies link on the popup cookie consent banner found on the Rent-A-Center Website would allow him to opt out of, decline, and/or reject cookies and other tracking technologies (inclusive of Necessary, Analytics and Marketing cookies).

109.    In selecting the "Decline" cookies link, Plaintiff Ayala gave Defendants notice that he did not consent to the use or placement of cookies and tracking technologies while browsing the Rent-A-Center Website. Further, Plaintiff Ayala specifically rejected, based on Defendants' representations, Necessary, Analytics and Marketing cookies and those that share information with third parties. In reliance on these representations and promises, only then did Plaintiff Ayala continue browsing the Rent-A-Center Website.

110.    Even before the popup cookie consent banner appeared on the screen, Defendants nonetheless caused cookies and tracking technologies, including Necessary, Analytics and Marketing cookies, to be placed on Plaintiff Ayala's device and/or transmitted to the Third Parties along with user data, without his knowledge. Accordingly, the popup cookie consent banner's representation to Plaintiff Ayala that he could reject the use and/or placement of cookies and tracking technologies while he browsed the Rent-A-Center Website was false. Contrary to what Defendants made Plaintiff Ayala believe, he did not have a choice about whether third-party cookies would be placed on his device and/or transmitted to the Third Parties along with his user data; rather, Defendants had already caused that to happen.

111.    Then, as Plaintiff Ayala continued to browse the Rent-A-Center Website in reliance on the promises Defendants made in the cookie consent banner, and despite Plaintiff Ayala's clear declination of the use and/or placement of such cookies and tracking technologies, Defendants nonetheless continued to cause the placement and/or transmission of cookies along with user data, including Necessary, Analytics and Marketing cookies from the Third Parties on

his device. In doing so, Defendants permitted the Third Parties to track and collect Plaintiff Ayala's Private Communications as he browsed the Rent-A-Center Website.

112.    Defendants' representations that consumers could "Decline" cookies while Plaintiff Ayala and users browsed the Rent-A-Center Website, or at least Necessary, Analytics and Marketing cookies, were untrue. Had Plaintiff Ayala known this fact, he would not have used the Rent-A-Center Website. Moreover, Plaintiff Ayala reviewed the popup cookie consent banner and Cookie Policy prior to using the Rent-A-Center Website. Had Defendants disclosed that they would continue to cause cookies and tracking technologies to be stored on consumers' devices even after they choose to decline/reject cookies, Plaintiff Ayala would have noticed it and would not have used the Rent-A-Center Website or, at a minimum, he would have interacted with the Rent-A-Center Website differently.

113.    Plaintiff Ayala continues to desire to browse content featured on the Websites. Plaintiff Ayala would like to browse websites that do not misrepresent that users can decline or reject cookies and tracking technologies. If the Websites were programmed to honor users' requests to decline cookies and tracking technologies, Plaintiff Ayala would likely browse the Rent-A-Center Website again in the future, but will not do so until then. Plaintiff Ayala regularly visits websites that feature content similar to that of the Websites. Because Plaintiff Ayala does not know how the Websites are programmed, which can change over time, and because he does not have the technical knowledge necessary to test whether the Websites honors users' requests to decline  cookies and tracking technologies, Plaintiff Ayala will be unable to rely on Defendants' representations when browsing the Websites in the future absent an injunction that prohibits Defendants from making misrepresentations on the Websites. The only way to determine what network traffic is sent to third parties when visiting a website is to use a specialized tool such as Chrome Developer Tools. As the name suggests, such tools are designed for use by "developers" (i.e., software developers), whose specialized training enables them to analyze the data underlying the HTTP traffic to determine what data, if any, is being sent to

CLASS ACTION COMPLAINT

whom. Plaintiff Ayala is not a software developer and has not received training with respect to HTTP network calls.

## **TOLLING**

114.    All applicable statutes of limitations have been tolled by operation of the delayed discovery doctrine, which delays accrual until Plaintiffs have, or should have, inquiry notice of their causes of action. Despite exercising reasonable diligence, Plaintiff Ayala was unaware of Defendant's fraudulent and unlawful conduct alleged herein due to Defendant's active concealment of material facts, which prevented Plaintiff Ayala from discovering his claims within the statute of limitations. As alleged above, Plaintiff Ayala does not have the expertise to test whether the Websites honored users' requests to decline  cookies and tracking technologies. Plaintiff Ayala was unaware that even though he rejected cookies on the Rent-A-Center Website, Defendants caused cookies, including the Third Parties' cookies, to be sent to his browser, stored on his devices, and transmitted to the Third Parties along with his private user data until on or around April 2024 when he learned of Defendant's privacy violations from his counsel.

115.    On or around June 25, 2024, Plaintiff Ayala notified Defendant of his claims and allegations asserted herein. Defendants were not prejudiced in their ability to gather evidence for Plaintiffs' claims since his claims were substantially similar to those raised in his June 25, 2024 letter.

## **CLASS ALLEGATIONS**

116.    Plaintiffs bring this Class Action Complaint on behalf of themselves and a proposed class of similarly situated persons, pursuant to Rules 23(b)(2) and (b)(3) of the Federal Rules of Civil Procedure. Plaintiffs seek to represent the following group of similarly situated persons, defined as follows:

> **Class**: All persons who browsed any of the Websites in the State of California after clicking the "Decline" link in the popup cookies consent banner within the four years preceding the filing of this Complaint (the "Class Period").

117.    This action has been brought and may properly be maintained as a class action against Defendants because there is a well-defined community of interest in the litigation and the proposed class is easily ascertainable.

118.    **Numerosity:** Plaintiffs do not know the exact size of the Class, but they estimate that it is composed of more than 100 persons. The persons in the Class are so numerous that the joinder of all such persons is impracticable and the disposition of their claims in a class action rather than in individual actions will benefit the parties and the courts.

119.    **Common Questions Predominate:** This action involves common questions of law and fact to the Class because each class member's claim derives from the same unlawful conduct that led them to believe that Defendants would not cause third-party cookies to be placed on their browsers and devices and/or transmitted to third parties along with user data, after Class members chose to decline cookies and tracking technologies on the Websites, nor would Defendants permit third parties to track and collect Class members' Private Communications as Class members browsed the Websites.

120.    The common questions of law and fact predominate over individual questions, as proof of a common or single set of facts will establish the right of each member of the Class to recover. The questions of law and fact common to the Class are:

a.    Whether Defendants' actions violate California laws invoked herein; and

b.    Whether Plaintiffs and Class members are entitled to damages, restitution, injunctive and other equitable relief, reasonable attorneys' fees, prejudgment interest and costs of this suit.

121.    **Typicality:** Plaintiffs' claims are typical of the claims of the other members of the Class because, among other things, Plaintiffs, like the other Class members, visited one or more of the Websites, declined cookies, and had their confidential Private Communications intercepted by the Third Parties.

CLASS ACTION COMPLAINT

122.    **Adequacy of Representation:** Plaintiffs will fairly and adequately protect the interests of all Class members because it is in their best interests to prosecute the claims alleged herein to obtain full compensation due to them for the unfair and illegal conduct of which they complain. Plaintiffs also have no interests in conflict with, or antagonistic to, the interests of Class members. Plaintiffs have retained highly competent and experienced class action attorneys to represent his interests and those of the Class. By prevailing on their claims, Plaintiffs will establish Defendants' liability to all Class members. Plaintiffs and their counsel have the necessary financial resources to adequately and vigorously litigate this class action, and Plaintiffs and counsel are aware of their fiduciary responsibilities to the Class members and are determined to diligently discharge those duties by vigorously seeking the maximum possible recovery for Class members.

123.    **Superiority:** There is no plain, speedy, or adequate remedy other than by maintenance of this class action. The prosecution of individual remedies by members of the Class will tend to establish inconsistent standards of conduct for Defendants and result in the impairment of Class members' rights and the disposition of their interests through actions to which they were not parties. Class action treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would engender. Furthermore, as the damages suffered by each individual member of the Class may be relatively small, the expenses and burden of individual litigation would make it difficult or impossible for individual members of the class to redress the wrongs done to them, while an important public interest will be served by addressing the matter as a class action. Plaintiffs are unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

CLASS ACTION COMPLAINT

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## **CAUSES OF ACTION**

### **First Cause of Action: Invasion of Privacy**

124.    Plaintiffs reallege and incorporate the paragraphs of this Complaint as if set forth herein.

125.    To plead an invasion of privacy claim, Plaintiffs must show an invasion of (i) a legally protected privacy interest; (ii) where Plaintiffs had a reasonable expectation of privacy in the circumstances; and (iii) conduct by Defendants constituting a serious invasion of privacy.

126.    Defendants have intruded upon the following legally protected privacy interests of Plaintiffs and Class members: (i) the California Invasion of Privacy Act, as alleged herein; (ii) the California Constitution, which guarantees Californians the right to privacy; (iii) the California Wiretap Acts as alleged herein; (iv) Cal. Penal Code § 484(a), which prohibits the knowing theft or defrauding of property "by any false or fraudulent representation or pretense;" and (v) Plaintiffs' and Class members' Fourth Amendment right to privacy.

127.    Plaintiffs and Class members had a reasonable expectation of privacy under the circumstances, as Defendants affirmatively promised users they could "Decline" cookies and tracking technologies before proceeding to browse the Websites. Plaintiffs and other Class members directed their electronic devices to access the Websites and, when presented with the popup cookies consent banner on the Websites, Plaintiffs and Class members declined cookies and reasonably expected that their declination of  cookies and tracking technologies would be honored. That is, they reasonably believed that Defendants would not permit the Third Parties to store and send cookies and/or use other such tracking technologies on their devices while they browsed the Websites. Plaintiffs and Class members also reasonably expected that, if they declined/rejected such cookies and/or tracking technologies, Defendants would not permit the Third Parties to track and collect Plaintiffs' and Class members' Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, on the Websites.

CLASS ACTION COMPLAINT

128.    Such information is "personal information" under California law, which defines personal information as including "Internet or other electronic network activity information," such as "browsing history, search history, and information regarding a consumer's interaction with an internet website, application, or advertisement." Cal. Civ. Code § 1798.140.

129.    Defendants, in violation of Plaintiffs' and other Class members' reasonable expectation of privacy and without their consent, permit the Third Parties to use cookies and other tracking technologies to collect, track, and compile users' Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data. The data that Defendants allowed third parties to collect enables the Third Parties to, *inter alia*, create consumer profiles containing detailed information about a consumer's behavior, preferences, and demographics; create audience segments based on shared traits (such as millennials, tech enthusiasts, etc.); and perform targeted advertising and marketing analytics. Further, the Third Parties share user data and/or the user profiles to unknown parties to further their financial gain. The consumer profiles are and can be used to further invade Plaintiffs' and users' privacy, by allowing third parties to learn intimate details of their lives, and target them for advertising and other purposes, as described herein, thereby harming them through the abrogation of their autonomy and their ability to control dissemination and use of information about them.

130.    Defendants' actions constituted a serious invasion of privacy in that they invaded a zone of privacy protected by the Fourth Amendment (i.e., one's personal communications), and violated criminal laws on wiretapping and invasion of privacy. These acts constitute an egregious breach of social norms that is highly offensive.

131.    Defendants' intrusion into Plaintiffs' privacy was also highly offensive to a reasonable person.

132.    Defendants lacked a legitimate business interest in causing the placement and/or transmission of third-party cookies along with user data that allowed the Third Parties to track,

intercept, receive, and collect Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, without their consent.

133.    Plaintiffs and Class members have been damaged by Defendants' invasion of their privacy and are entitled to just compensation, including monetary damages.

134.    Plaintiffs and Class members seek appropriate relief for that injury, including but not limited to, damages that will compensate them for the harm to their privacy interests as well as disgorgement of profits made by Defendants as a result of their intrusions upon Plaintiffs' and Class members' privacy.

135.    Plaintiffs and Class members seek punitive damages because Defendants' actions—which were malicious, oppressive, willful—were calculated to injure Plaintiffs and Class members and made in conscious disregard of Plaintiffs' and Class members' rights and Plaintiffs' and Class members' declination of the Websites' use of cookies. Punitive damages are warranted to deter Defendants from engaging in future misconduct.

**<u>Second Cause of Action</u>: Intrusion Upon Seclusion**

136.    Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

137.    To assert a claim for intrusion upon seclusion, Plaintiffs must plead (i) that Defendants intentionally intruded into a place, conversation, or matter as to which Plaintiffs had a reasonable expectation of privacy; and (ii) that the intrusion was highly offensive to a reasonable person.

138.    By permitting third-party cookies to be stored on consumers' devices without consent, which enabled the Third Parties to track and collect Plaintiffs' and Class members' Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, in violation of Defendants' representations otherwise in the popup cookie consent banner,

Defendants intentionally intruded upon the solitude or seclusion of Website users. Defendants effectively placed the Third Parties in the middle of communications to which they were not invited, welcomed, or authorized.

139.    The Third Parties' tracking and collecting of Plaintiffs' and Class member's Private Communications on the Websites using third-party cookies that Defendants caused to be stored on users' devices—and to be transmitted to Third Parties—was not authorized by Plaintiffs and Class members, and, in fact, those Website users specifically chose to "Decline" cookies.

140.    Plaintiffs and the Class members had an objectively reasonable expectation of privacy surrounding their Private Communications on the Websites based on Defendants' promise that users could "Decline" cookies, as well as state criminal and civil laws designed to protect individual privacy.

141.    Defendants' intentional intrusion into Plaintiffs' and other users' Private Communications would be highly offensive to a reasonable person given that Defendants represented that Website users could "Decline" cookies when, in fact, Defendants caused such third-party cookies to be stored on consumers' devices and browsers, and to be transmitted to third parties, even when consumers rejected all such cookies. Indeed, Plaintiffs and Class members reasonably expected, based on Defendants' false representations, that when they declined cookies and tracking technologies, Defendants would not cause such third-party cookies to be stored on their devices or permit the Third Parties to obtain their Private Communications on the Websites, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data.

142.    Defendants' conduct was intentional and intruded on Plaintiffs' and users' Private Communications on the Websites.

143.    Plaintiffs and Class members have been damaged by Defendants' invasion of their privacy and are entitled to just compensation, including monetary damages.

144.    Plaintiffs and Class members seek appropriate relief for that injury, including but not limited to, damages that will compensate them for the harm to their privacy interests as well as disgorgement of profits made by Defendants as a result of their intrusions upon Plaintiffs' and Class members' privacy.

145.    Plaintiffs and Class members seek punitive damages because Defendants' actions—which were malicious, oppressive, willful—were calculated to injure Plaintiffs and Class members and made in conscious disregard of Plaintiffs' and Class members' rights and Plaintiffs' and Class members' rejection of the Websites' use of cookies. Punitive damages are warranted to deter Defendants from engaging in future misconduct.

**Third Cause of Action: Wiretapping in Violation of the California Invasion of Privacy Act (California Penal Code § 631)**

146.    Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

147.    California Penal Code § 631(a) provides, in pertinent part:

> "Any person who, by means of any machine, instrument, or contrivance, or in any other manner . . . willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state; or who uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained, or who aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section, is punishable by a fine not exceeding two thousand five hundred dollars . . . ."

148.    The California Supreme Court has repeatedly stated an "express objective" of CIPA is to "protect a person placing or receiving a call from a situation where the person on the other end of the line permits an outsider to tap his telephone or listen in on the call." *Ribas v. Clark*, 38 Cal. 3d 355, 364 (1985) (emphasis added).

149.    Further, as the California Supreme Court has held, in explaining the legislative purpose behind CIPA:

> While one who imparts private information risks the betrayal of his confidence by the other party, a substantial distinction has been recognized between the secondhand repetition of the contents of a conversation and *its simultaneous*

*dissemination to an unannounced second auditor, whether that auditor be a person or mechanical device.*

As one commentator has noted, such secret monitoring denies the speaker an important aspect of privacy of communication— the right to control the nature and extent of the firsthand dissemination of his statements.

*Ribas*, 38 Cal. 3d at 360-61 (emphasis supplied; internal citations omitted).

150.    CIPA § 631(a) imposes liability for "distinct and mutually independent patterns of conduct." *Tavernetti v. Superior Ct.*, 22 Cal. 3d 187, 192-93 (1978). Thus, to establish liability under § 631(a), Plaintiffs need only establish that Defendants, "by means of any machine, instrument, contrivance, or in any other manner," did ***any*** of the following:

[i] Intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system;

[ii] Willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line or cable or is being sent from or received at any place within this state;

[iii] Uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained

Cal. Penal Code § 631(a).

151.    CIPA § 631(a) also penalizes those who [iv] "aid[], agree[] with, employ[], or conspire[] with any person" who conducts the aforementioned wiretapping, or those who "permit" the wiretapping.

152.    Defendants are "persons" within the meaning of California Penal Code § 631.

153.    Section 631(a) is not limited to phone lines, but also applies to "new technologies" such as computers, the Internet, and email. *See Matera v. Google Inc.*, 2016 WL 8200619, at *21 (N.D. Cal. Aug. 12, 2016) (CIPA applies to "new technologies" and must be construed broadly to effectuate its remedial purpose of protecting privacy); *see also Bradley v. Google, Inc.*, 2006 WL 3798134, at *5–6 (N.D. Cal. Dec. 22, 2006) (CIPA governs "electronic communications"); *Javier v. Assurance IQ, LLC*, 2022 WL 1744107, at *1 (9th Cir. May 31, 2022) ("Though written in terms of wiretapping, Section 631(a) applies to Internet communications.").

154. The Third Parties' cookies—as well as the software code of the Third Parties responsible for placing the cookies and transmitting data from user devices to the Third Parties—constitute "machine[s], instrument[s], or contrivance[s]" under the CIPA (and, even if they do not, Defendants' deliberate and purposeful scheme that facilitated the interceptions falls under the broad statutory catch-all category of "any other manner").

155. Each of the Third Parties is a "separate legal entity that offers [a] 'software-as-a-service' and not merely a passive device." *Saleh v. Nike, Inc.*, 562 F. Supp. 3d 503, 520 (C.D. Cal. 2021). Further, the Third Parties had the capability to use the wiretapped information for their own purposes and, as alleged above, they did in fact use the wiretapped information for their own business purposes. Accordingly, the Third Parties were third parties to any communication between Plaintiffs and Class members, on the one hand, and Defendants, on the other. *Id.* at 521; *see also Javier v. Assurance IQ, LLC*, 649 F. Supp. 3d 891, 900 (N.D. Cal. 2023).

156. Under § 631(a), Defendants must show they had the consent of all parties to a communication.

157. At all relevant times, the Websites caused Plaintiffs and Class members' browsers to store the Third Parties' cookies and to transmit those cookies alongside Private Communications—including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data—to the Third Parties without Plaintiffs' and Class members' consent. By configuring the Websites in this manner, Defendants willfully aided, agreed with, employed, permitted, or otherwise enabled the Third Parties to wiretap Plaintiffs and Class members using the Third Parties' cookies and to accomplish the wrongful conduct alleged herein.

158. At all relevant times, by their cookies and corresponding software code, the Third Parties willfully and without the consent of all parties to the communication, or in any unauthorized manner, read, attempted to read, and/or learned the contents or meaning of

electronic communications of Plaintiffs and Class members, on the one hand, and Defendants, on the other, while the electronic communications were in transit or were being sent from or received at any place within California.

159.    The Private Communications of Plaintiffs and Class members, on the one hand, and Defendants, on the other, that the Third Parties automatically intercepted directly communicates the Website user's affirmative decisions, actions, choices, preferences, and activities, which constitute the "contents" of electronic communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data.

160.    At all relevant times, the Third Parties used or attempted to use the Private Communications automatically intercepted by their cookie tracking technologies for their own purposes.

161.    Plaintiffs and Class members did not provide their prior consent to the Third Parties' intentional access, interception, reading, learning, recording, collection, and usage of Plaintiffs' and Class members' electronic communications. Nor did Plaintiffs and Class members provide their prior consent to Defendants aiding, agreeing with, employing, permitting, or otherwise enabling the Third Parties' conduct. On the contrary, Plaintiffs and Class members expressly declined to allow Third Parties' cookies and tracking technologies to access, intercept, read, learn, record, collect, and use Plaintiffs' and Class members' electronic communications by choosing to decline cookies in the consent banner.

162.    The wiretapping of Plaintiffs and Class members occurred in California, where Plaintiffs and Class members accessed the Websites and where the Third Parties—as enabled by Defendant—routed Plaintiffs' and Class members' electronic communications to Third Parties' servers. Among other things, the cookies, as well as the software code responsible for placing the cookies and transmitting them and other Private Communications to the Third Parties, resided on Plaintiffs' California-located device. In particular, the user's California-based device, after

downloading the software code from the Third Parties' servers, (i) stored the code onto the user's disk; (ii) converted the code into machine-executable format; and (iii) executed the code, causing the transmission of data (including cookie data) to and from the Third Parties.

163.    Plaintiffs and Class members have suffered loss by reason of these violations, including, but not limited to, (i) violation of their right to privacy, (ii) loss of value in his and their Private Communications, (iii) damage to and loss of Plaintiffs' and Class members' property right to control the dissemination and use of their Private Communications, and (iv) loss of their Private Communications to the Third Parties with no consent.

164.    Pursuant to California Penal Code § 637.2, Plaintiffs and Class members have been injured by the violations of California Penal Code § 631, and each seeks statutory damages of the greater of $5,000, or three times the amount of actual damages, for each of Defendants' violations of CIPA § 631(a), as well as injunctive relief.

165.    Unless enjoined, Defendants will continue to commit the illegal acts alleged herein including, but not limited to, permitting third parties to access, intercept, read, learn, record, collect, and use Plaintiffs' and Class members' electronic Private Communications with Defendants.  Plaintiffs, Class members, and the general public continue to be at risk because Plaintiffs, Class members, and the general public frequently use the internet to search for information and content related to consumer products and rent-to-own products. Plaintiffs, Class members, and the general public continue to desire to use the internet for that purpose. Plaintiffs, Class members, and the general public have no practical way to know if their request to decline cookies and tracking technologies will be honored and/or whether Defendants will permit third parties to access, intercept, read, learn, record, collect, and use Plaintiffs' and Class members' electronic Private Communications with Defendants. Further, Defendants have already permitted the Third Parties to access, intercept, read, learn, record, collect, and use Plaintiffs' and Class members' electronic Private Communications with Defendants and will continue to do so unless and until enjoined.

**Fourth Cause of Action**: Use of a Pen Register in Violation of the California Invasion

of Privacy Act (California Penal Code § 638.51)

166.    Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

167.    The California Invasion of Privacy Act, codified at Cal. Penal Code §§ 630 to 638, includes the following statement of purpose:

> The Legislature hereby declares that advances in science and technology have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications and that the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society.

168.    California Penal Code Section 638.51(a) proscribes any "person" from "install[ing] or us[ing] a pen register or a trap and trace device without first obtaining a court order."

169.    A "pen register" is a "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication." Cal. Penal Code § 638.50(b).

170.    The Third Parties' cookies and the corresponding software code installed by Defendants on the Websites are each "pen registers" because they are "device[s] or process[es]" that "capture[d]" the "routing, addressing, or signaling information"—including, the IP address and user-agent information—from the electronic communications transmitted by Plaintiffs' and the Class's computers or devices. Cal. Penal Code § 638.50(b).

171.    At all relevant times, Defendants caused the Third Parties' cookies and the corresponding software code—which are pen registers—to be placed on Plaintiffs' and Class members' browsers and devices, and/or to be used to transmit Plaintiffs' and Class members' IP address and user-agent information. *See Greenley v. Kochava,* 2023 WL 4833466, at *15-16 (S.D. Cal. July 27, 2023); *Shah v. Fandom, Inc.*, 2024 U.S. Dist. LEXIS 193032, at *5-11 (N.D. Cal. Oct. 21, 2024).

172.    Some of the information collected by the Third Parties' cookies and the corresponding software, including IP addresses and user-agent information, does not constitute

CLASS ACTION COMPLAINT

the content of Plaintiffs' and the Class members' electronic communications with the Websites. *In re Zynga Privacy Litig.*, 750 F.3d 1098, 1008 (9th Cir. 2014). ("IP addresses constitute addressing information and do not necessarily reveal any more about the underlying contents of communication…") (cleaned up).

173.    Plaintiffs and Class members did not provide their prior consent to Defendants' use of third-party cookies and the corresponding software. On the contrary, Plaintiffs and the Class members informed Defendants that they did not consent to the Websites' use of third-party cookies by clicking the "Decline" cookies link in the cookie consent banner.

174.    Defendants did not obtain a court order to install or use the third-party cookies and corresponding software to track and collect Plaintiffs' and Class member's IP addresses and user-agent information.

175.    As a direct and proximate result of Defendants' conduct, Plaintiffs and Class members suffered losses and were damaged in an amount to be determined at trial.

176.    Pursuant to Penal Code § 637.2(a)(1), Plaintiffs and Class members are also entitled to statutory damages of $5,000 for each of Defendants' violations of § 638.51(a).

### **Fifth Cause of Action**: Common Law Fraud, Deceit and/or Misrepresentation

177.    Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

178.    Defendants fraudulently and deceptively informed Plaintiffs and Class members that they could "Decline" cookies.

179.    However, despite Defendants' representations otherwise, Defendants caused third-party cookies and software code to be stored on consumers' devices, and to be transmitted to the Third Parties alongside Private Communications, even after users clicked the "Decline" cookies link in the popup cookie consent banner. These cookies and corresponding software code allowed the Third Parties to access, intercept, read, learn, record, collect, and use Plaintiffs' and Class members' Private Communications, even when consumers had previously chosen to "Decline" cookies.

180.    These misrepresentations and omissions were known exclusively to, and actively concealed by Defendants, not reasonably known to Plaintiffs and Class members, and material at the time they were made. Defendants knew, or should have known, how the Websites functioned, including the Third Party's resources they installed on the Websites and the third-party cookies in use on the Websites, through testing the Websites, evaluating their performance metrics by means of their accounts with the Third Parties, or otherwise, and knew, or should have known, that the Websites' programming allowed the third-party cookies to be placed on users'—including Plaintiffs'—browsers and devices and/or transmitted to the Third Parties along with users' Private Communications even after users attempted to "Decline" cookies, which Defendants promised Website users they could do. Defendants' misrepresentations and omissions concerned material facts that were essential to the analysis undertaken by Plaintiffs and Class members as to whether to use the Websites. In misleading Plaintiffs and Class members and not so informing them, Defendants breached their duties to Plaintiffs and Class members. Defendants also gained financially from, and as a result of, their breaches.

181.    Plaintiffs and Class members relied to their detriment on Defendants' misrepresentations and fraudulent omissions.

182.    Plaintiffs and Class members have suffered an injury-in-fact, including the loss of money and/or property, as a result of Defendants' unfair, deceptive, and/or unlawful practices, including the unauthorized interception of his and their Personal Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, which have value as demonstrated by the use and sale of consumers' browsing activity, as alleged above. Plaintiffs and Class members have also suffered harm in the form of diminution of the value of his and their private and personally identifiable information and communications.

183.    Defendants' actions caused damage to and loss of Plaintiffs' and Class members' property right to control the dissemination and use of their personal information and communications.

184.    Defendants' representations that consumers could decline cookies (including Necessary, Analytics and Marketing cookies) if they clicked the "Decline" cookies link was untrue. Again, had Plaintiffs and Class members known these facts, they would not have used the Websites. Moreover, Plaintiffs and Class members reviewed the popup cookie consent banner and Cookie Policy prior to their interactions with the Websites. Had Defendants disclosed that they caused third-party cookies to be stored on Website users' devices, including Necessary, Analytics and Marketing cookies, and/or share information with third parties even after they choose to decline cookies, Plaintiffs and Class members would have noticed it and would not have interacted with the Websites.

185.    By and through such fraud, deceit, misrepresentations and/or omissions, Defendants intended to induce Plaintiffs and Class members to alter their positions to their detriment. Specifically, Defendants fraudulently and deceptively induced Plaintiffs and Class members to, without limitation, use the Websites under the mistaken belief that Defendants would not permit third parties to obtain users' Private Communications when consumers chose to decline cookies. As a result, Plaintiffs and the Class provided more personal data than they would have otherwise.

186.    Plaintiffs and Class members justifiably and reasonably relied on Defendants' misrepresentations and omissions, and, accordingly, were damaged by Defendants' conduct.

187.    As a direct and proximate result of Defendants' misrepresentations and/or omissions, Plaintiffs and Class members have suffered damages, as alleged above, and are entitled to just compensation, including monetary damages.

188.    Plaintiffs and Class members seek punitive damages because Defendants' actions—which were malicious, oppressive, willful—were calculated to injure Plaintiffs and Class members and made in conscious disregard of Plaintiffs' and Class members' rights and

Plaintiffs' and Class members' declination of the Websites' use of cookies. Punitive damages are warranted to deter Defendants from engaging in future misconduct.

**Sixth Cause of Action**: Unjust Enrichment

189.    Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

190.    Defendants created and implemented a scheme to increase their own profits through a pervasive pattern of false statements and fraudulent omissions.

191.    Defendants were unjustly enriched as a result of their wrongful conduct, including through their misrepresentation that users could "Decline" cookies and by permitting the Third Parties to store and transmit cookies on Plaintiffs' and Class members' devices and browsers, which permitted the Third Parties to track and collect users' Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, even after Class members rejected such cookies.

192.    Plaintiffs and Class members' Personal Communications have conferred an economic benefit on Defendants.

193.    Defendants have been unjustly enriched at the expense of Plaintiffs and Class members, and Defendants have unjustly retained the benefits of their unlawful and wrongful conduct.

194.    Defendants appreciated, recognized, and chose to accept the monetary benefits that Plaintiffs and Class members conferred onto Defendants at their detriment. These benefits were the expected result of Defendants acting in their pecuniary interest at the expense of Plaintiffs and Class members.

195.    It would be unjust for Defendants to retain the value of Plaintiffs' and Class members' property and any profits earned thereon.

196.     There is no justification for Defendants' enrichment. It would be inequitable, unconscionable, and unjust for Defendants to be permitted to retain these benefits because the benefits were procured as a result of their wrongful conduct.

197.     Plaintiffs and Class members are entitled to restitution of the benefits Defendants unjustly retained and/or any amounts necessary to return Plaintiffs and Class members to the position that they occupied prior to having their Private Communications tracked and collected by the Third Parties.

198.     Plaintiffs plead this claim separately, as well as in the alternative, to their other claims, as without such claims Plaintiffs would have no adequate legal remedy.

**Seventh Cause of Action: Trespass to Chattels**

199.     Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

200.     Defendants, intentionally and without consent or other legal justification, caused cookies to be stored on Plaintiffs' and Class members' browsers and devices, which enabled the Third Parties and Defendants to track and collect Plaintiffs' and Class members' Private Communications and use the data collected for their own advantage, as described above.

201.     Defendants were unjustly enriched as a result of their wrongful conduct, including through their misrepresentations that users could decline cookies and tracking technologies, and through their failure to disclose that Defendants cause third-party cookies to be stored on consumers' devices and browsers, which cause the Third Parties and Defendants to track and collect Plaintiffs' and Class members' Private Communications even after consumers chose to decline or reject such cookies.

202.     Defendants intentionally caused third party software code to be stored onto Plaintiffs' and Class members' devices, knowing that the code would be executed by those devices. The software code then placed and/or transmitted cookies along with Plaintiffs' and Class members' Private Communications to the Third Parties. These intentional acts interfered with Plaintiffs' and Class members' use of the following personal property owned, leased, or

controlled by Plaintiffs and other users: (a) their computers and other electronic devices; and (b) their personally identifiable information.

203.    Defendants' trespass of Plaintiffs' and other users' computing devices resulted in harm to Plaintiffs and other users and caused Plaintiffs and other users the following damages:

        a.    Nominal damages for trespass;

        b.    Reduction of storage, disk space, and performance of Plaintiffs' and other users' computing devices; and

        c.    Loss of value of Plaintiffs' and other users' computing devices.

## PRAYER FOR RELIEF

**WHEREFORE**, reserving all rights, Plaintiffs, on behalf of themselves and the Class members, respectfully request judgment against Defendants as follows:

A.    Certification of the proposed Class, including appointment of Plaintiffs' counsel as class counsel;

B.    An award of compensatory damages, including statutory damages where available, to Plaintiffs and Class members against Defendants for all damages sustained as a result of Defendants' wrongdoing, including both pre- and post-judgment interest thereon;

C.    An award of punitive damages;

D.    An award of nominal damages;

E.    An order for full restitution;

F.    An order requiring Defendants to disgorge revenues and profits wrongfully obtained;

G.    An order temporarily and permanently enjoining Defendants from continuing the unlawful, deceptive, fraudulent, and unfair business practices alleged in this Complaint;

H.    For reasonable attorneys' fees and the costs of suit incurred; and

I.    For such further relief as may be just and proper.

Plaintiffs HEREBY demand a jury.

Dated: January 17, 2025

CLASS ACTION COMPLAINT

**GUTRIDE SAFIER LLP**

*/s/ Seth A. Safier/s/*
Seth A. Safier (State Bar No. 197427)
  seth@gutridesafier.com
Marie A. McCrary (State Bar No. 262670)
  marie@gutridesafier.com
Todd Kennedy (State Bar No. 250267)
  todd@gutridesafier.com
Kali R. Backer (State Bar No. 342492)
  kali@gutridesafier.com
100 Pine Street, Suite 1250
San Francisco, CA 94111
Telephone: (415) 639-9090
Facsimile:  (415) 449-6469

*Attorneys for Plaintiffs*

CLASS ACTION COMPLAINT